# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-1277

_____

| | | |
|---|---|---|
| Ellison Kalda, M.D.; Robert K. Dahl, M.D.; Marilyn McFarlane, P.A.; David H. Hylland, Ed.D.; Richard G. Whitten, Ph.D.; Cynthia L. Pilkington, Ph.D.; Mary K. Kunde, Ph.D.; Individually and for their individual plan accounts and on behalf of The Central Plains Clinic, Ltd. Money Purchase Pension and Profit Sharing Plan and The Central Plains Clinic, Ltd. 401(k) Plan, | * * * * * * * * * * * | |
| Appellants, | * * * | Appeal from the United States District Court for the District of South Dakota. |
| v. | * * | |
| Sioux Valley Physician Partners, Inc., formerly known as Central Plains Clinic, Ltd.; Sioux Valley Hospital; T. A. Schultz, M.D.; Richard Hardie, M.D.; Gene Burrish, M.D.; David Danielson; Michael Farritor, M.D.; John Rittmann, M.D.; Steven Salmela, M.D., | * * * * * * * * | |
| Appellees. | * | |

_____

Submitted: October 19, 2006
Filed: March 29, 2007

_____

Before SMITH, BOWMAN, and COLLOTON, Circuit Judges.

_____

BOWMAN, Circuit Judge.

The plaintiffs brought this action under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001–1461 (2000), alleging that the defendants breached several fiduciary duties and violated the terms of two ERISA plans. The District Court[1] granted the defendants' motion to dismiss one breach-of-fiduciary-duty claim and granted the defendants' motion for summary judgment on all remaining claims. We affirm the judgment of the District Court.

I.

This case results from the events leading up to the merger of Central Plains Clinic, Ltd. (CPC) with Sioux Valley Physician Partners, Inc. (SVC). The plaintiffs are former employees of CPC whose employment ended prior to the merger.[2] CPC administered two ERISA plans in which the plaintiffs participated—a Money Purchase Pension Plan (MPPP) and a Profit Sharing Plan (PSP). The PSP was discretionarily funded by CPC, while the MPPP was a defined-benefit plan that provided for contributions by CPC based on a percentage of a participant-employee's compensation. CPC reserved the right to amend, modify, terminate, or suspend contributions to the MPPP at any time.

_____

[1]The Honorable Lawrence L. Piersol, United States District Judge for the District of South Dakota.

[2]Dr. Dahl resigned and Ms. McFarlane retired on December 31, 2000. Dr. Hylland resigned on February 28, 2001. CPC discontinued psychological services effective March 31, 2001, which terminated the services of Drs. Whitten, Pilkington, and Kunde. Dr. Kalda resigned on April 1, 2001. CPC shareholders approved the merger on April 17, 2001, after the plaintiffs' employment with CPC ended.

-2-

In response to financial difficulties, on December 11, 1998, CPC adopted an amendment to the MPPP that reduced CPC's contributions to the MPPP from twenty-five percent of each participant's compensation to zero. CPC informed participants that it hoped to resume contributions to the MPPP in the future if CPC became financially stable. CPC maintained balance sheets that tracked the amounts that it would have contributed to the MPPP from 1998 to 2001 if not for the zero-funding amendment. For the calendar year 1998, CPC contributed to the PSP an amount equal to what it would have contributed to the MPPP if not for the zero-funding amendment. CPC made no contributions to either plan for the calendar years 1999, 2000, and 2001.

In 2000, CPC separately met with SVC and Avera McKenna Hospital to explore financial options, including a sale or merger. CPC elected to pursue a merger with SVC, and on December 18, 2000, the parties executed a letter of intent to merge. As part of the proposed merger, SVC offered retention-incentive bonuses to CPC employees who transferred to SVC in amounts equal to the amounts that would have been contributed to the MPPP if not for the zero-funding amendment. On March 26, 2001, CPC adopted a merger and stock-purchase agreement, subject to shareholder approval. This agreement provided that physicians who remained with SVC for two years after the merger and other employees who remained with SVC for thirty days after the merger qualified for the bonuses. The agreement did not provide for retroactive funding of either plan.

Meanwhile, CPC's largest lender had urged Avera to make an alternative proposal to CPC. In a proposal made to CPC shareholders on March 30, 2001, Avera stated that it would pay physicians "[a]ll pension contributions not made during the past two years." J.A. at 956. SVC then agreed to pay CPC's debt to the lender, and the CPC board of directors approved and executed the agreement with SVC on April 4, 2001. The CPC board conducted a side-by-side evaluation of the SVC and Avera proposals on April 12, 2001, and reaffirmed its decision to proceed with the SVC merger. On April 17, 2001, CPC shareholders approved the merger. Because

the plaintiffs' employment with CPC ended prior to the merger's approval, they were ineligible for the retention-incentive bonuses.

The plaintiffs commenced this action asserting various ERISA theories, including breaches of the plans, see 29 U.S.C. § 1132(a)(1)(B), and breaches of fiduciary duties, see 29 U.S.C. §§ 1104 and 1106. The plaintiffs sought funding of the MPPP and PSP and funding of the participants' accounts for unpaid contributions, a declaratory judgment, an equitable accounting, and disgorgement of improper benefits. The District Court granted the defendants' motion to dismiss a claim alleging that the zero-funding amendment was a breach of fiduciary duty. The plaintiffs do not appeal from that portion of the final judgment. The District Court later granted the defendants' motion for summary judgment on all remaining claims. The District Court denied the plaintiffs' motion for reconsideration of the summary-judgment order. Plaintiffs appeal with respect to the entry of summary judgment. We review the grant of summary judgment de novo and may affirm the judgment on any grounds supported by the record. Bass v. SBC Commc'ns, Inc., 418 F.3d 870, 872 (8th Cir. 2005). Summary judgment is appropriate where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Id.

II.

The plaintiffs claim that the defendants made an "unequivocal promise" that once CPC became financially stable, it would fund the plans in the amount that would have been contributed to the MPPP absent the zero-funding amendment. Appellants' Br. at 26. According to the plaintiffs, because CPC knew that this re-funding would not occur, the promise amounted to a misrepresentation. The District Court held that CPC's statements, when viewed in the light most favorable to the plaintiffs, were not misrepresentations. The plaintiffs assert that the District Court erred in granting summary judgment because a genuine issue of material fact exists as to whether these statements constitute misrepresentations.

-4-

In deposition testimony, the plaintiffs stated that CPC made several statements between 1998 and 2000 that support their misrepresentation claim, such as: "[CPC] said they were going to keep track of [the amount of unpaid contributions], and potentially if we got healed - - when we got healed we'd get it back," J.A. at 220; "[O]nce the financial stability of the clinic improved, [the PSP] would be funded," id. at 221; and "[T]hey also told us [the amount of unpaid MPPP contributions] was going on the books and when they became financially stable they would pay it," id. at 222. The plaintiffs contrast these statements with a memorandum summarizing a merger proposed on October 30, 2000 that included a reference to the payment of retention-incentive bonuses "instead of profit sharing contributions," id. at 302, and the December 18, 2000, letter of intent to merge that stated SVC would either make a contribution to the PSP or provide employees compensation "in lieu of" a PSP contribution, id. at 985. The plaintiffs therefore conclude that CPC knowingly promised PSP or MPPP re-funding when it knew that re-funding would not occur.

An ERISA fiduciary must "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1), and must comply with the common-law duty of loyalty, including the "obligation to deal fairly and honestly with all plan members," Shea v. Esensten, 107 F.3d 625, 628 (8th Cir.) (citing Varity Corp. v. Howe, 516 U.S. 489, 506 (1996)), cert. denied, 522 U.S. 914 (1997). Accordingly, a fiduciary may "'not affirmatively miscommunicate or mislead plan participants about material matters regarding their ERISA plan'" when discussing a plan. In re Xcel Energy, Inc., 312 F. Supp. 2d 1165, 1176 (D. Minn. 2004) (quoting In re Enron Corp., 284 F. Supp. 2d 511, 555 (S.D. Tex. 2003)); see Varity, 516 U.S. at 506 (observing that "'[l]ying is inconsistent with the duty of loyalty'" (citation omitted)); Anderson v. Resolution Trust Corp., 66 F.3d 956, 960 (8th Cir. 1995). A statement is materially misleading if there is "a substantial likelihood that it would mislead a reasonable employee in the process of making an adequately informed decision regarding . . . benefits to which she might be entitled." Krohn v. Huron Mem'l Hosp., 173 F.3d 542, 551 (6th Cir. 1999). Additionally, a fiduciary has a duty

to inform when it knows that silence may be harmful, <u>Shea</u>, 107 F.3d at 629 (quotations and citations omitted), and cannot remain silent if it knows or should know that the beneficiary is laboring under a material misunderstanding of plan benefits, <u>Griggs v. E.I. Dupont De Nemours & Co.</u>, 237 F.3d 371, 381 (4th Cir. 2001). The duty of loyalty requires a fiduciary to disclose any material information that could adversely affect a participant's interests. <u>Shea</u>, 107 F.3d at 628; <u>see</u> <u>Eddy v. Colonial Life Ins. Co. of Am.</u>, 919 F.2d 747, 750 (D.C. Cir. 1990) ("The duty to disclose material information is the core of a fiduciary's responsibility . . . .").

Before proceeding with the merits of any breach-of-fiduciary-duty claim, we must address the threshold issue of whether the defendants were acting in a fiduciary or an employer capacity when the acts in question took place. <u>Pegram v. Herdrich</u>, 530 U.S. 211, 226 (2000). Under ERISA, a person is a fiduciary with respect to a plan:

> *to the extent* (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A) (emphasis added). This statute requires that an employer-fiduciary "wear the fiduciary hat when making fiduciary decisions." <u>Pegram</u>, 530 U.S. at 225 (citing <u>Hughes Aircraft Co. v. Jacobson</u>, 525 U.S. 432, 443–44 (1999); <u>Varity</u>, 516 U.S. at 497).

The plaintiffs argue that an employer-administrator acts as a fiduciary as defined by ERISA if the employer makes statements relating to a business decision

that also relate to the administration of an ERISA plan. In support of their conclusion, the plaintiffs cite Varity, where the employer-fiduciary held a meeting to persuade employees to transfer to a subsidiary and assured them that their benefits would be secure if they did so, even though it knew that the subsidiary was insolvent. 516 U.S. at 493–94. The Varity Court concluded that the employer's intentional statements about the likelihood of future plan benefits in that context amounted to an act of plan administration and thus the employer was acting as a fiduciary. Id. at 505; accord Anderson, 66 F.3d at 960. Here, we will assume for the purposes of the misrepresentation claim that CPC was acting as an administrator-fiduciary when it made statements concerning the possibility of future funding of either plan. See Varity, 516 U.S. at 502.

Viewing the statements in the light most favorable to the plaintiffs, CPC's statements were not misrepresentations. The statements about funding either plan when CPC became financially stable constituted no more than a future hope or goal, and these statements were too vague to qualify as "unequivocal promise[s]." That the statements were qualified by the words "if" and "potentially" further illustrate that the statements were speculative and that the employees could not reasonably rely on them when making decisions about their benefits. Indeed, in describing her understanding of the statements, one plaintiff stated, "I *assumed* when things were refinanced . . . the plan would be taken care of." J.A. at 234 (emphasis added). Furthermore, the facts do not indicate, as the plaintiffs contend, that CPC knew that re-funding of the plans was certain *not* to occur upon the merger, as re-funding was considered in the letter of intent to merge. This case is distinguishable from Varity, where the defendants affirmatively told employees that if they changed jobs, their pensions would be guaranteed, even though the defendants knew their statements were false. 516 U.S. at 494. Here, CPC did not promise that it would re-fund either plan upon the occurrence a merger or any other event. Moreover, CPC had no reason to know whether the plaintiffs were laboring under a misunderstanding that would have triggered the duty to inform, since several plaintiffs testified that they "assumed"

CPC's statements were promises to re-fund the plans. J.A. at 226, 228, 234. For these reasons, the plaintiffs' misrepresentation claim fails.

## III.

The plaintiffs also allege that CPC breached its fiduciary duties in the course of negotiating and ultimately merging with SVC because it failed to adequately consider the Avera proposal.[3] The plaintiffs argue that CPC breached its duty of loyalty by considering only its own interests and not those of the participants when merging with SVC.

While a fiduciary must "discharge his duties with respect to a plan solely in the interest of the participants," 29 U.S.C. § 1104(a)(1), "the fiduciary provisions of ERISA are not implicated in the sale of a business merely because the terms of the sale will affect contingent and non-vested future retirement benefits," Phillips v. Amoco Oil Co., 799 F.2d 1464, 1471 (11th Cir. 1986) (cited with approval in Hickman v. Tosco Corp., 840 F.2d 564, 566 (8th Cir. 1988)), cert. denied, 481 U.S. 1016 (1987). Thus, normal business decisions with potential collateral effects on prospective, contingent benefits need not be made in the interest of plan participants. Hickman, 840 F.2d at 566. In other words, "ERISA does not prohibit an employer from acting in accordance with its interests as employer when not administering the plan." Phillips, 799 F.2d at 1471. This dual-capacity standard may distinguish transactions that are subject to ERISA's fiduciary provisions from those transactions

___

[3]The plaintiffs also attempt to raise, for the first time, several other alleged breaches, including CPC's failure to verify the eligibility of plan participants, enforce shareholders' rights, and collect and gather trust assets. We do not address claims that have been raised for the first time on appeal. See Norwest Bank of N.D., N.A. v. Doth, 159 F.3d 328, 334 (8th Cir. 1998). The plaintiffs also argue that SVC is liable as a nonfiduciary, but the plaintiffs fail to identify any evidence in the record to support this claim.

that are not.  <u>Martin v. Feilen</u>, 965 F.2d 660, 666 (8th Cir. 1992), <u>cert. denied</u>, 506 U.S. 1054 (1993); <u>see</u> <u>Pegram</u>, 530 U.S. at 225–26.

We held in <u>Hickman</u> that the defendant-administrators' refusal to allow the plaintiffs to remain on the payroll to become eligible for retirement benefits did not implicate ERISA's fiduciary duties because that decision was a "day-to-day corporate business transaction."  840 F.2d at 566 (quotations and citations omitted); <u>accord</u> <u>Adams v. LTV Steel Mining Co.</u>, 936 F.2d 368, 370 (8th Cir. 1991), <u>cert. denied</u>, 502 U.S. 1073 (1992).  In this case, negotiating the merger with SVC and ultimately declining to pursue an agreement with Avera were business decisions made by CPC that did not trigger ERISA's fiduciary provisions.  Accordingly, CPC's decision to merge with SVC rather than Avera did not itself breach a fiduciary duty owed by CPC to the plaintiffs.

Even if CPC in its capacity as administrator was required to carefully and impartially evaluate the merger's effect on the plan participants, <u>see</u> <u>Schaefer v. Ark. Med. Soc'y</u>, 853 F.2d 1487, 1492 (8th Cir. 1988); <u>Donovan v. Bierwirth</u>, 680 F.2d 263, 271 (2d Cir.), <u>cert. denied</u>, 459 U.S. 1069 (1982), we are convinced that CPC carefully assessed the impact of the merger on the plan participants, especially considering CPC's side-by-side comparison of the competing proposals.  Moreover, contrary to the plaintiffs' assertions, the record indicates that CPC did in fact retain a consulting firm to evaluate the proposals.  Therefore, the plaintiffs' claims that CPC breached its fiduciary duties during its consideration of Avera's proposal fail.

IV.

The plaintiffs next contend that the defendants breached their duty to properly manage plan assets. <u>See</u> <u>Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc.</u>, 472 U.S. 559, 572 (1985). Specifically, the plaintiffs argue that in exchange for positions at SVC, the CPC officers bargained away MPPP and PSP contributions in

the form of the balance sheets that tracked the amounts that would have been paid to either plan absent the zero-funding amendment. To support such a claim, "plan assets" within the meaning of ERISA must be involved. See 29 U.S.C. § 1002(21)(A); NYSA-ILA Med. & Clinical Servs. Fund v. Catucci, 60 F. Supp. 2d 194, 200 (S.D.N.Y. 1999). The District Court held that CPC's balance sheets were not "plan assets" because there was no vesting language in any of the plan documents and any obligation to fund the plans was contingent upon an improvement in CPC's financial condition. The plaintiffs alternatively argue that "plan assets" are involved because: (1) the plaintiffs were promised these unpaid contributions in lieu of wages; (2) the balance sheets constituted a beneficial interest under ordinary notions of property law; or (3) the required vesting language was expressed in the plan documents.

ERISA does not exhaustively define the term "plan assets," although the regulations define the term to include amounts that participants pay to an employer or have withheld from their wages for contribution to a plan. 29 C.F.R. § 2510.3-102(a). The Secretary of Labor has repeatedly defined "plan assets" consistently with "ordinary notions of property rights," including in the definition any funds in which a plan has obtained a "beneficial interest." See, e.g., 2005-08A Op. Dep't of Labor at *6–7 (May 11, 2005); 2003-05A Op. Dep't of Labor at *5 (April 10, 2003); 2001-02A Op. Dep't of Labor at *5 n.2 (Feb. 15, 2001); 94-31A Op. Dep't of Labor at *3–4, 7 (Sept. 9, 1994); 93-14A Op. Dep't of Labor at *10–11 (May 5, 1993); 92-22A Op. Dep't of Labor at *8–10 (Oct. 27, 1992). Whether a plan has acquired a beneficial interest in particular funds depends on "whether the plan sponsor expresses an intent to grant such a beneficial interest or has acted or made representations sufficient to lead participants and beneficiaries of the plan to reasonably believe that such funds separately secure the promised benefits or are otherwise plan assets." 94-31A Op. Dep't. of Labor at *7 (Sept. 9, 1994).

Agency interpretations in opinion letters are "entitled to respect" to the extent that they have the "power to persuade." Christensen v. Harris County, 529 U.S. 576, 587 (2000) (quoting Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944)). Whether a letter has the "power to persuade" is based on factors such as the "thoroughness evident in [the agency's] consideration, the validity of its reasoning, [and] its consistency with earlier and later pronouncements." Skidmore, 323 U.S. at 140. We find the Secretary's reasoning in its rulings regarding "plan assets" thorough, valid, and particularly consistent. Cf. In Re Luna, 406 F.3d 1192, 1199–1200 (10th Cir. 2005) (applying the Secretary's approach).

The record does not support the plaintiffs' assertion that the unpaid contributions were promised in lieu of wages; therefore, the unpaid contributions do not qualify as plan assets under the regulations. Nor do we agree with the plaintiffs that CPC expressed an intent to grant either plan a beneficial interest in the balance sheets or that CPC made representations sufficient to lead reasonable participants to believe that the balance sheets secured any promised benefits or were otherwise "plan assets." The plaintiffs argue that CPC's use of the term "accrued expenses" on the balance sheets indicated an intent to grant the plans an interest in the unpaid contributions. J.A. at 216–17. This argument is undermined, however, by CPC's statements describing the *potential* for *future* funding of the plans as a *possibility* or a *hope*. The unpaid contributions were simply recorded as ledger entries with the possibility of future repayment. It would be unreasonable to conclude from these balance sheets that the plans had acquired a beneficial interest in the unpaid contributions under ordinary notions of property rights.

Moreover, the term "accrued" as used in the balance sheets cannot reasonably be interpreted synonymously with the ERISA definition of an "accrued benefit." In the case of a defined-benefit plan such as the MPPP, an "accrued benefit" is created by the plan itself. 29 U.S.C. § 1002(23)(A). Under the MPPP, participants were eligible for *available* benefits if they completed 1000 hours of service and were

-11-

employed on the last day of the plan year (i.e., December 31). Since the MPPP was zero-funded beginning with the December 1998 plan year, no benefits were available or accrued between 1998 and 2001. The label "accrued expenses" on the balance sheets did not convert the unpaid contributions into "plan assets" under the Secretary's approach.

This conclusion is consistent with cases cited by the District Court holding that unpaid contributions were "plan assets" where *the language of the plan documents* agreed to by the parties described the amounts at issue as "accrued to" or "due and owing." Laborers Combined Funds of W. Pa. v. Cioppa, 346 F. Supp. 2d 765, 771 (W.D. Pa. 2004); Galgay v. Gangloff, 677 F. Supp. 295, 301–02 (M.D. Pa. 1987); cf. ITPE Pension Fund v. Hall, 334 F.3d 1011, 1013–16 (11th Cir. 2003). Here, no plan document contains vesting language that *obligated* CPC to make payments to either plan, see, e.g., Luna, 406 F.3d at 1199–1200; therefore, no beneficial interest was created. Because the plaintiffs cannot establish that the amounts tracked in CPC's balance sheets were "plan assets," their asset-mismanagement claim fails.

V.

The plaintiffs also argue that CPC is liable under 29 U.S.C. § 1132(a)(1)(B) for failing to retroactively fund either the PSP or MPPP as allegedly promised. Since the PSP was funded at CPC's discretion and the MPPP was validly zero-funded in December 1998, the plaintiffs' claim requires a finding that one of the plans was amended as a result of CPC's alleged promises to retroactively fund either or both of the plans.

To the extent that the plaintiffs are claiming an amendment to either plan based on CPC's oral representations, we reject these claims because ERISA generally prohibits the oral amendment of plan terms. Palmisano v. Allina Health Sys., Inc., 190 F.3d 881, 888 (8th Cir. 1999). To the extent that the plaintiffs are claiming an

amendment based on CPC's balance sheets, we also reject these claims because CPC's balance sheets did not purport to amend the plans. Cf. Borst v. Chevron Corp., 36 F.3d 1308, 1323 (5th Cir. 1994) (holding that CEO's written statements about plans that did not purport to be formal plan amendments were not amendments under the same reasoning that supports the prohibition against oral amendments), cert. denied, 514 U.S. 1066 (1995). Accordingly, we reject the plaintiffs' breach-of-plan claim.

VI.

The plaintiffs' final claims allege that CPC breached a fiduciary duty by amending the MPPP to add the zero-funding provision. "In general, an employer's decision to amend a pension plan concerns the composition or design of the plan itself and does not implicate the employer's fiduciary duties . . . ." Hughes, 525 U.S. at 444; see Varity, 516 U.S. at 505; Anderson, 66 F.3d at 960. The District Court granted the defendants' motion to dismiss the plaintiffs' breach-of-fiduciary-duty claim and the plaintiffs did not appeal this order. The plaintiffs agree that the amendment itself is not actionable but attempt to restyle this claim as part of their misrepresentation argument. We find no merit in the plaintiffs' argument. The District Court disposed of this claim, and the plaintiffs did not appeal that decision. We therefore do not further consider it.

The plaintiffs also claim that the zero-funding amendment deprived them of accrued benefits, see 29 U.S.C. § 1054(g), and that CPC failed to comply with ERISA's notice-of-amendment procedure, see id. § 1054(h). These claims are not properly preserved for appeal because they were first raised in the plaintiffs' motion for reconsideration, and the District Court correctly refused to consider them in its denial of the motion for reconsideration. See Capitol Indem. Corp. v. Russellville Steel Co., 367 F.3d 831, 834 (8th Cir. 2004).

## VII.

For the foregoing reasons, we affirm the judgment of the District Court.

_____